# Commonwealth *ex rel.* Middleton *versus* The Commissioners of Allegheny County.

$\frac{37}{127}$ $\frac{237}{536}$

*Jurisdiction of Supreme Court.—Liability of Counties for Railroad Subscriptions.—Mandamus and Return.*

1. The constitution invests the Supreme Court with a jurisdiction coextensive with the state, and the legislature has no power to limit this jurisdiction, or to prohibit the court from issuing their writs at any time to all parts of the state. The court merely acquiesce in the division of the state into districts, as a convenient arrangement for business.

2. Where an Act of Assembly authorized county commissioners to subscribe to the stock of a railroad company, and made it a condition precedent that the grand jury recommend the subscription, *held*, that it is no valid objection to the bonds issued in payment of the subscription, that the officers of the company were admitted to the grand jury room, and permitted to urge the subscription. Nor is it any defence to the bonds in the hands of an innocent purchaser, that the recommendation of the subscription was obtained by unfair and corrupt means.

3. Issuing bonds, which were received in payment of the county's subscription, is borrowing money for that purpose.

4. The substitution of smaller bonds for one bond of the full amount of the subscription, is simply changing the evidence of indebtedness, and is no valid objection to the bonds so substituted.

5. A contract between the company and the county, that the former should pay the interest on the bonds until the road should be completed, does not affect the holder of the bonds, nor prevent him from recovering the interest from the county.

6. Making the bonds on their face payable to bearer, amounts to a direction that the bonds shall be transferable by delivery, like a bank-note or a bill of exchange.

7. Argumentative inferences in a return, or sworn allegations which are merely constructive deductions, and which if false are not indictable as perjuries, cannot be treated as presenting distinct issues of fact.

8. Respondents are bound to return plain and direct answers to all the material allegations in a writ of *mandamus*, and in this light every part of the return is to be judged. If a confession and avoidance for a plea of fraud be intended, all the necessary facts should be distinctly stated, and not left to inference.

9. It is not requisite to the issuing of a *mandamus* commanding public officers to perform official duties neglected by them, that the complainant should have previously demanded of them to perform their duty.

MANDAMUS.—This was an alternative *mandamus* issued out of the Supreme Court, in the name of the Commonwealth of Pennsylvania, on the relation of E. P. Middleton against the Commissioners of Allegheny county, commanding them to assess and levy a tax to provide for the payment of the interest upon bonds issued by the said county, in payment of its subscription to the capital stock of the " Chartiers Valley Railroad Company."

The writ was issued while the court was in session in the Eastern District of the Commonwealth, and set forth the incorporation and organization of the Chartiers Valley Railroad Com-

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

pany, the Act of Assembly authorizing "the Commissioners of Allegheny county, or a majority of them, on the recommendation of the grand jury, to subscribe an amount not exceeding 5000 shares to the capital stock of the said company, in the name and behalf of the county, to borrow money to pay therefor, and to make provision for the payment of the principal and interest of the money so borrowed, as in other cases of loans to corporations;" that the grand jury of the said county, at June Term 1853, recommended the commissioners to subscribe for 300 shares, or $150,000 of the stock of the company; that the said commissioners did subscribe for this number of shares, and in payment of said subscription issued certificates of loan or coupon bonds for $1000 each, dated March 22d 1854, signed by the commissioners with the seal of the county; that the relator purchased, and is possessed in his own right of one of said certificates of loan or coupon bonds; that they were transferred by the said company in conformity with the Act of Assembly relative thereto; that a large amount of interest is due to the relator and other holders of said bonds, which the county had wholly neglected or refused to pay or make provision for; that it was the duty of the commissioners, under the laws of Pennsylvania, to provide annually for the payment of this interest; that on the 26th of October 1857, a resolution which had been passed for this purpose was revoked and rescinded by them, whereby they have wrongfully refused to provide for the payment of the interest due on said bonds, and the relator thereby rendered unable to recover the amount for a long time due and unpaid to him, and that the said commissioners have declared their unwillingness to provide for the said payment:" and commanding the commissioners of the county, to wit, William Perkins, John McIlhenny, and Zacheus Patterson, at their next annual meeting for estimating the probable expenses of the county, to make full and ample provision for raising money to pay the interest on said bonds, or show cause why they cannot do so."

The writ was in the name of the Chief Justice of Pennsylvania, and tested at Philadelphia, February 4th 1859.

By a copy of the bond held by the relator, which was attached to his petition, it appeared that they were made payable twenty-five years after date, to the "Chartiers Valley Railroad Company, or bearer," with interest at six per cent. per annum.

The writ was served February 9th 1859, on McIlhenny personally and by copy, on Patterson in the same way, and on Perkins personally, and by delivering the original writ to him.

To this writ a return was filed April 18th 1859, setting forth at length the matters of defence, which are all noticed in the opinion of the Supreme Court in this case, and in the cases reported in 8 Casey 218, and 10 Id. 495.

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

This case was argued at Pittsburgh, October 21st 1859, by *Harding* and *Meredith,* for the relator, and by *Williams, Barton,* and *Howard,* for the respondents.

The opinion of the court was delivered, November 9th 1860, by

WOODWARD, J.—The numerous and technical exceptions taken to the relator's writ, and to the form of remedy he seeks, were so fully answered in Thomas's Case, 8 Casey 218, and Hamilton's Case, 10 Casey 496, that it would be a vain repetition to go over them again; and I dismiss them all by referring to those two reports, and come at once to the matters set forth in the return which the commissioners have made to the alternative *mandamus* issued at the instance of the relator.

1. It is objected that the writ was issued out of this court whilst it was sitting in the Eastern District; and hence, it is argued, the commissioners are not amenable to it.

The 5th article of the constitution establishes the Supreme Court; and invests it with a jurisdiction co-extensive with the state. The jurisdiction must exist at all times in its entirety. If the legislature could suspend it for an hour in one part of the state, it might suspend it for a day or a month in another part, and thus virtually abolish it altogether. The jurisdiction was conferred by the whole people of the state for their own benefit, and is held in trust for them. They have given the legislature no power to suspend, abridge, or annihilate it. The legislature have divided the state into districts for the sessions of the court to hear arguments, and the arrangement has been acquiesced in as convenient for the business of the court; but there is not a word in the constitution about districts of the Supreme Court. The constitution speaks of districts for the Courts of Common Pleas; but it everywhere treats the Supreme Court as an institution of the state. If the legislation which divides the state into districts, for the sessions of the court, were to be held to limit the range of the court's writs to the district in which the court was sitting, it would be a palpable infraction of the fundamental law; but it has never been so considered. On the contrary, the practice has been to issue writs, make orders and decrees, and enter judgments in one district whilst sitting in another; and the practice has been sanctioned by direct judicial decisions: 9 Harris 9; 10 Casey 496. In no other manner, indeed, can the whole business of the court be transacted. The respondents have no reason to complain that the writ against them was issued agreeably to the constitution and the uniform practice of the court.

2. It is admitted that the legislature incorporated the Chartiers Valley Railroad Company, and authorized the commissioners of Allegheny county, upon the recommendation of one grand jury,

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

to subscribe to the stock of said company to an amount not exceeding five thousand shares of the capital stock of said company—to borrow money to pay therefor, and to make provision for the payment of principal and interest of the money so borrowed. It is further admitted that the grand jury did, at the June Sessions of 1853, recommend a subscription of three thousand shares—that the commissioners subscribed therefor, and issued a certificate of loan or bond therefor in the aggregate sum of $150,000 to the company, but it is objected that the recommendation of the grand jury was obtained by improper means and influences, and in a way not contemplated by the Act of Assembly. The only specification of improper means is that the doors of the grand jury room were thrown open to the officers of the company, and the said officers allowed to urge their suit "by such representations as they thought proper to make in the absence and without the knowledge of the people, who were without means of access or information."

It has been replied to this that it was not a charge of any false or fraudulent representation so specific as to be capable of judicial investigation—that no person representing "the people" was excluded from the grand jury, or is charged to have been excluded—and that the duty assigned to the grand jury was not of that judicial and private nature which belongs properly to their office, but was like those deliberations to which they are sometimes called in respect to bridges and other county edifices, when interested parties are always admitted to their presence to make representations to influence their judgment. This reply is a sufficient answer to this part of the commissioners' return. But there is another.

The county was authorized to subscribe to the stock of a railroad company, and to borrow money to make good the subscription in the usual manner of corporate subscriptions and payments to railroad stocks. The grand jury and the commissioners were the county's agents for this purpose—a different duty being assigned to each. The commissioners now defending sustain the same relation to the county—are indeed the self-same agent who made the subscription, though the individuals constituting the body are changed. A creditor, who loaned part of the money, calls on this agent to make provision, according to his sworn official duty, for the interest on the money borrowed, when he refuses because of the misconduct of a fellow-agent—the grand jury. The misconduct is alleged in such vague generalities as to be unfit for judicial inquiry—is unjust to the grand jury, who are no parties to this proceeding, and stands opposed to the visible fact that they recommended a subscription of only three-fifths of the shares they were empowered to recommend; but setting all this aside, and supposing the charge of misconduct investi-

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

gated and established, what had the relator to do with it? It is not alleged that *he* corrupted the grand jury, or caused them to be corrupted. It is not even pretended that he was present at, or had knowledge of their deliberations. How, then, are the sins of the grand jury to be visited on him? A debtor refuses to pay even interest to his creditor, because one of the debtor's agents advised another of the debtor's agents in a wrong manner to contract the debt. Was such a defence ever heard of before? The authority of both agents is admitted, but one is able, falsely or truly, to impute bad manners to the other, and this is seriously urged as a reason why a pecuniary obligation should be repudiated. To put the principle at the base of this defence into a strong light—if one of my agents should advise another of my agents to get possession of a neighbour's goods by theft or otherwise, I may with good conscience receive and retain the goods without account. If such a standard of ethics is anywhere to be found, it should not be looked for in a court of justice.

If the county of Allegheny really believed she had been betrayed by her own grand jury, why did she not interpose by some other organ, or by a tax-payer, to stop the subscription; or when she found it made, and the bonds in the market, why did she not fly to the judicial tribunals to enjoin against farther sales, and to procure a return of what had been wrongfully issued? Why did she not return, or offer to return, the stock she purchased with her bonds, and undo, as fast as she could, the deed into which her imprudent agent had betrayed her? These are pertinent questions; and, unanswered as they are, they lead inevitably to the conclusion that the county never thought of alleging misconduct in the grand jury, until some excuse was to be looked up for not paying interest. It is no excuse now that it is found; for, to make the most of it, it was *res inter alios acta,* with which the creditor had nothing to do.

3. It is next alleged that no money was borrowed. This is an evasive answer, and meets nothing in the relator's information. He charges that the commissioners issued bonds in payment of the subscription, and that is undenied.

Now, to say inferentially, that the issuing of bonds was not to borrow money, is to trifle with language which the usages of business have rendered perfectly definite. Everybody knows that when a municipal corporation, or a county, obtains legislative authority to subscribe for stocks, and borrow money to pay therefor, the legislature means that they are to issue a marketable bond, in exchange for the stock subscribed. Perhaps the universal understanding might be better expressed; but the county of Allegheny knew well enough what was meant. The money was borrowed in the manner that is customary. A prac-

1 WR.—16

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

tice so well understood is not to be questioned now. This part of the return is dismissed as a mere quibble on words.

4. The objection that several bonds, after they were prepared, signed, and sealed, could not be lawfully substituted for the one large bond of $150,000, was sufficiently considered and answered in Thomas's Case: 8 Casey 218.

5. The 5th point shall be noticed in connection with the 7th.

6. The 10th section of the Act of 1853 provides that the railroad company "shall *also* pay or provide for the payment of the interest upon said certificates of loan or bonds until the said railroad shall be completed," and hence the respondents deduce the conclusion or inference that the county is not liable, the road being yet uncompleted. This is not charging any matter of fact, but rather a legal inference, and I proceed to show that, as such, it is erroneous. The bond binds the county to pay the interest. Its language is very express—"which sum the said county promises to pay twenty-five years after date hereof to the said company *or bearer*, with interest, at the rate of six per cent. per annum, payable semi-annually on the first days of October and April." Now, as between the county and the company, there would be reason in setting off the statutory duty of the company against the covenant obligation of the county, and thus relieve the county from paying interest to the company. But the covenant of the county was not only to the company, but to the "bearer" of the bond, and the present suit is by a bearer against the county. As between *these* parties the county is clearly liable to pay. The terms of the contract fix the liability. The company are also liable by force of the statute. The legislature meant to give the purchaser of a bond a cumulative security for his interest, and thereby to increase the credit of the loan. It was expected, doubtless, that after the completion of the road it would pay such dividends on the stock held by the county, that the county could well enough afford to be alone bound for the interest from that time forth; but until the road should be completed, both county and company should be bound for the interest—the county as the principal debtor, by virtue of an express engagement; "also" the company as a subsidiary debtor, by force of the statute. This word "also" was not intended to make the same interest twice payable, but to bind both corporations to the creditor for its faithful payment once. When, therefore, an unpaid interest is demanded of the principal debtor, it is not competent for him to refuse to pay because his surety is also liable. To show that the company had actually paid the interest would be a defence for the county, but merely to point to the company's legal liability to pay is no defence.

5th and 7th. In reference to the matters alleged under the 5th head it is sufficient to say, that if the commissioners did not

direct how the bonds were to be transferable when they made them payable to the company or bearer, they would be bound to recognise any lawful holder as entitled to the interest. They were to direct the mode of transfer, but the manner of direction was not prescribed. It might be by resolution or proclamation, or by words inserted in their bond. And if they adopted either mode, it is not for them to complain that it was not the right mode.

Taking the whole of the 7th point together, it is impossible to regard it as anything else than a statement of a legal inference, that under the Act of Assembly there could be no transfer of the bonds by the company, and of course no property acquired in them by purchasers until the commissioners had, by some formal act, directed the mode of transfer. I repeat, that making the bonds on their face payable to the company or bearer was a sufficient direction as to their transferableness. What was it but a direction in precise language that the bond should be transferable by delivery, like a bank-note or a bill of exchange? Does not a bank, or an individual, direct how notes shall be transferred, by making them payable to order or bearer? We never heard it doubted before, and probably never shall again.

But it was argued that this seventh plea tendered two direct issues of fact. It was said very confidently that here was a plain assertion that the relator was not a *bonâ fide* holder of any bond —and another equally distinct assertion that no bond had been sold by the company—and as the demurrer must be taken as admitting these facts, it was insisted that the relator had no case in court.

There is a mode of testing the question whether this seventh point does indeed fairly present these two vital facts. Let us apply it.

Messrs. Perkins, McIlhenney, and Patterson, having sworn that the facts set forth in their return are true, I will suppose them to be indicted for perjury in swearing that "E. P. Middleton is not the *bonâ fide* holder of any of said bonds," and that "none of said bonds have been sold by the company." It is not impossible to suppose that at the trial of that indictment Mr. Middleton would exhibit the bond he has spread upon the present record, and would prove that the county commissioners issued it to the railroad company, who put it into the market and sold it, and that he paid a valuable consideration for it. He might, perhaps, show farther, that the defendants were well informed of all these facts before they took that rash oath. He would demand their conviction; but could they be convicted? Certainly not, for their answer would be that the criminal pleader had no right to separate these assertions from the con-

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

text, but was bound to take them as he found them, and that, as they stand in the return, they amount to no more than an argumentative inference from certain premises previously assumed. Our inferences, they would say, may be mistakes, but mistaken inferences are not indictable as perjuries. On reference to the document, it would be found that they had previously alleged that under the Act of Assembly the bonds were to be transferable, as might be directed by the commissioners; that the commissioners had not, at any time, "directed the manner in which the said bonds shall be transferable, as it was their province only under the Act of Assembly to do," and then we are to read the seventh point as an inference therefrom: "And the said defendants altogether deny that the said E. P. Middleton is a *bonâ fide* holder of any of the said bonds, or that the same, or any of them, have been transferred in accordance with the aforesaid Act of Assembly, but on the contrary, charge it to be true that none of the said bonds have been sold by the said company, and that the same are not yet properly transferable *in the absence of any direction by the commissioners of said county, or any of them, as to the manner in which the same shall be transferable.*"

This is all one sentence, and, in connection with the context, shows that what the respondents meant to allege was a construction of the Act of Assembly, to wit, that there could be no transfer of bonds in the absence of direction by the commissioners, and therefore, because of that legal necessity, no bonds had been sold, and Middleton was the *bonâ fide* holder of none. The facts asserted are hedged in before and behind by the premises from which they were deductions.

Thus these assertions would dwindle into mere guesses as to the proper construction of an Act of Assembly, and, of course, would not be assignable for perjury. He would be accounted a very stupid criminal judge who would mistake them for independent and substantive facts. In this manner, the penalties of perjury would be averted. But the defendants have no right to insist on our treating them as assertions of fact, when it is so apparent that they would be claimed as mere legal inferences in the Quarter Sessions. Whichever they are, they should be the same in both courts; and since they would assuredly be treated as inferences in the Criminal Court, we consider them here as nothing but inferences. As such they have been already answered in what was said above of the effect of making the bonds payable to bearer.

Another observation may be made on this seventh point. If the two facts charged be separated from the verbiage which surrounds them, they amount to no denial of anything in the

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

plaintiff's case. He alleges, both in his complaint and writ, that he purchased, and is possessed in his own right, of one of said certificates of loan or bonds, representing one thousand dollars. *Purchase* and *possession* are all he alleges by way of title. What answer to the allegation of purchase does the seventh point give? Simply, "that none of said bonds have been sold *by the said company*." That may be true, and yet the relator's allegation be true also. He does not allege a purchase of the company, but simply a purchase. It being a marketable article, and one that is often hypothecated as a security for money, it is easy to conceive how this bond, and even the whole batch, may have found their way into market and been lawfully sold by pledgees without the concurrence of the company. Then as to the relator's possession, the point does not deny it, but denies that he " is a *bonâ fide* holder of any of said bonds." How, why, wherefore, is not alleged except on the ground that the company have sold no bonds, and the commissioners have not prescribed the mode of transfer. It is apparent that this is not a flat and distinct traverse of the relator's title, as he has set that title forth. It is never to be forgotten that the respondents are bound to return plain and direct answers to the allegations of the writ, and in this light every part of the return is to be judged. To suggest, in answer to a plea of possession, that the plaintiff is not a *bonâ fide* holder, is good for nothing. If it were meant as a plea by way of confession and avoidance, the possession claimed by the relator should have been admitted, and the circumstances set forth that were relied on to impeach his title. If fraud was intended to be pleaded, it should have been set forth fully enough to give the relator notice of what he was to meet. As it stands in the return, this seventh point is either a mere legal inference of facts from certain premises; or, if it be regarded as a plea of substantive facts, they are not only insufficiently alleged, but, when tried by the writ, are found to be evasive and irrelevant.

The eighth, ninth, and tenth points suggest topics that were discussed in the two previous cases.

11. If the commissioners had shown us that they had faithfully levied all the taxes which by law they are empowered to assess, they would have presented a good defence against a peremptory *mandamus*. But until they attain the legal limit by actual assessment and collection, such speculative views as are set forth under this head go for nothing.

The only other point in the return which has not been met and overruled by the previous decisions, is the complaint that the relator has never demanded "*payment*" of his claim of the county, or of the proper officers of the county. The relator sets

[Commonwealth *ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

forth the liability of the county—the pledge of her "faith, credit, and property" for the interest upon the entire loan—the resolution of the commissioners of May 25th 1857, for levying a tax to meet the accrued and accruing interest, and the revocation of that resolution on October 26th 1857, and then alleges that the county "has wholly and wrongfully neglected to make any provision whatever, for the payment of said interest so accruing on the certificates of loan or bonds, although as aforesaid authorized and required to do as in other cases of loans to corporations." Now, it is no answer to the case which the relator presents that he has not demanded payment of his claim. The time has not come for him to demand *payment*. He asks us to exercise the powers which we possess under the constitution and laws of the Commonwealth, to compel the commissioners to assess and collect a tax, as by law they are required to do, that the treasury of the county may be placed in a condition to pay the interest on a loan, part of which he holds. When they shall have been obedient to the demands of the constitution and laws, to their oaths of office, and to the decrees of this court, it will be soon enough for the relator to demand payment of his claim.

If it was meant by this objection that he should have demanded of the respondents a performance of their official duties before suing out a *mandamus*, the answer is that, because it was a public duty which they were elected and sworn to perform, and because they actually began to perform it without request or demand from any creditor, it was not necessary for the relator to precede his application for a *mandamus* with request or demand. If the commissioners may neglect this duty until somebody interested requests them to perform it, we know of no duty of their office which they may not in like manner neglect. And if *they* may wait for individual requests and demands before going forward in a plainly-marked path, other public officers may likewise halt in the way prescribed for them to walk in, and the end will be that laws will become ropes of sand, and government an unsubstantial dream.

The duty of the commissioners was plain and imperative before any *mandamus* issued. We know very well that circumstances had occurred which rendered it a disagreeable duty to perform, but disagreeable duties attach to every public trust. Had the respondents gone forward in the faithful and fearless discharge of the duty which they had assumed, they would have had the sympathy of all good men, and the support of the judicial tribunals, and their official conduct would not have stained the honour of the county.

On a full review of the return before us, we are compelled by a due regard to our own official obligations to pronounce it an

[*Commonwealth ex rel.* Middleton *v.* Commissioners of Allegheny Co.]

inadequate excuse for not obeying the alternative *mandamus,* and therefore a peremptory writ must be awarded.

> And now, to wit, November 9th 1860, this cause having been argued by counsel and fully considered, it is ordered and adjudged that judgment be entered upon the demurrer for the Commonwealth, and that the defendants and their successors in office be and they are hereby peremptorily commanded to make, at their next annual meeting for estimating the probable expenses of said county of Allegheny, full and ample provision for the payment of all the interest upon the bonds issued by the county of Allegheny, in payment of the said subscription of said county of $150,000 to the capital stock of the Chartiers Valley Railroad Company, which shall, at the time of the said estimate, be due and unpaid, and also all the interest which shall become due and payable on said bonds in the year next succeeding such meeting of them the said commissioners—and that the said defendants immediately thereafter issue their proper warrants to the collectors of the county rates and levies of the said county for the collection thereof, and that they forthwith pay the costs of this suit.

LOWRIE, C. J., dissented.